# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
Filed: November 10, 2025

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * | | |
| KELLY WALKER, | * | PUBLISHED |
| | * | |
| Petitioner, | * | No. 21-278V |
| | * | |
| v. | * | Special Master Nora Beth Dorsey |
| | * | |
| SECRETARY OF HEALTH | * | Decision Awarding Damages; Influenza |
| AND HUMAN SERVICES, | * | ("Flu") Vaccine; Nerve Injury; Pain and |
| | * | Suffering. |
| Respondent. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * | | |

Isaiah Kalinowski, Bosson Legal Group, Fairfax, VA, for Petitioner.
Austin Joel Egan, U.S. Department of Justice, Washington, DC, for Respondent.

## DAMAGES DECISION[1]

On January 7, 2021, Kelly Walker ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2018).[2] Petitioner alleged that she suffered from a Table shoulder injury related to vaccine administration ("SIRVA") or nerve injury in her left shoulder following the administration of an influenza ("flu") vaccination on October 29, 2019. Amended ("Am.") Petition at 1-6 (ECF No. 28). On February 24, 2025, the undersigned issued a ruling on

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2018). All citations in this Decision to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

entitlement, finding Petitioner entitled to compensation for "a left axillary or radial neuritis nerve injury or inflammation," also characterized as a "nerve injury," she developed following her October 2019 flu vaccination.  Ruling on Entitlement dated Feb. 24, 2025 (ECF No. 71).

The parties were unable to resolve damages and requested that the Court enter a schedule for damages briefs.  Since then, the parties' briefs have been filed.

After consideration of all of the evidence, and for the reasons described below, the undersigned finds that Petitioner is entitled to $35,000.00 for actual pain and suffering.

**I.      PROCEDURAL HISTORY**

Petitioner filed his petition on January 7, 2021.  Petition.  The early procedural history from January 2021 through February 2025 was set forth in the undersigned's Ruling on Entitlement and will not be repeated here.  See Ruling on Entitlement at 2.

Thereafter, the parties engaged in settlement discussions but were not able to resolve this matter informally.  Joint Status Report ("Rept."), filed July 2, 2025 (ECF No. 81).  The parties believed ADR would not be productive and requested a briefing schedule.  Id.  On July 11, 2025, Petitioner filed a memorandum in support of his claim for damages.  Petitioner's Memorandum of Law Regarding Damages ("Pet. Memo."), filed July 11, 2025 (ECF No. 84).  Respondent filed his responsive brief on August 13, 2025.  Respondent's Brief on Damages ("Resp. Br."), filed Aug. 13, 2025 (ECF No. 85).  Petitioner filed a reply on August 29, 2025.  Pet. Reply Memo. of Law Regarding Damages ("Pet. Reply Memo."), filed Aug. 29, 2025 (ECF No. 86).

This matter is now ripe for adjudication.

**II.     FACTUAL HISTORY**

**A.     Brief Medical Record History**[3]

Petitioner received a flu vaccination on October 29, 2019 at her place of work.  Pet. Ex. 2 at 2.  Nine days later, on November 7, 2019, Petitioner saw her primary care provider ("PCP") for gastrointestinal complaints.  Pet. Ex. 5 at 35-37.  No complaints of left shoulder or arm symptoms were documented at this visit.  See id.

On December 10, 2019, 45 days after vaccination, Petitioner returned to her PCP.  Pet. Ex. 5 at 58. Petitioner reported a "sharp pain down her left arm" when she received her flu vaccination in October 2019.  Id.  "[Petitioner] state[d] that it feels like pins and needles and some numbness since. [Petitioner] has full [range of motion] and has no pain."  Id.  Petitioner further reported her symptoms "mostly affects her while driving long distances."  Id.  Additionally, she stated her symptoms "do[] not [a]ffect the strength of her arm, it is more of an

---

[3] This medical record summary was largely taken from the parties' damages briefs, with edits from the undersigned, as the undersigned finds the parties accurately depicted the facts and circumstances here.  See Pet. Memo. at 1-6; Resp. Br. at 2-3.

2

annoyance than anything." Id.  On examination, Petitioner had full strength and range of motion. Id. at 59.  Assessment was "[p]ain in left arm." Id.  Her PCP commented, "[Petitioner has] had pain in her arm, now has numbness and tingling.  I imagin[e] that whoever gave her the injection hit a nerve." Id.  Petitioner was given a referral to neurology even though her PCP indicated uncertainty regarding the potential for treatment. Id.

On June 1, 2020, Petitioner saw a neurologist for her left arm and primarily complained of a tingling sensation.  Pet. Ex. 5 at 101.  History of present illness summarized Petitioner's clinical course.  Id.  Petitioner received a flu vaccination in her left arm on October 29, 2019 and "instantly had severe pain that caused her to cry." Id.  "The pain was directly at the injection site." Id.  She then developed a tingling sensation throughout the entire arm, which she felt was progressively worsening.  Id.  She also reported difficulty driving and gardening.  Id.  Petitioner reported attempting to see a neurologist in January 2020, "but they [did] not accept workers compensation." Id.  On examination, Petitioner had full strength, full reflexes, no weakness, and full range of motion in her left arm.  Id. at 102.  Petitioner had intact sensation except for decreased pinprick sensation on the left arm and left upper extremity.  Id.  Assessment was "[p]aresthesia of the skin." Id.  The neurologist opined Petitioner had "dysesthesias on the left after a flu shot in October 2019" with "some change in sensation on the affected side." Id.  An electromyography ("EMG") of the left upper extremity was recommended.  Id.

On June 4, 2020, Petitioner saw a neurologist for an independent medical evaluation.  Pet. Ex. 5 at 107.  She reported hypersensitivity and "electric sensations running up and down" her left arm.  Id.  Petitioner's examination was normal except for heightened sensitivity to pinprick and vibration in her entire left arm.  Id. at 108.  The neurologist concluded that there was "no neurological explanation for [Petitioner's] condition" because "[i]f the injection needle damages a nerve, it would cause numbness, loss of sensation in the zone of the nerve and not heightened sensation in the entire left arm." Id.

On July 6, 2020, Petitioner underwent an EMG/ nerve conduction study ("NCS").  Pet. Ex. 3 at 1.  On examination, Petitioner had intact sensation and normal strength in the left upper extremity except 4/5 anterior shoulder flexion.  Id.  The EMG/NCS test was "abnormal." Id.  The study was "most consistent with left axillary and/or radial neuritis. . . .  The etiology of this injury may have been due to direct trauma to the nerve versus indirect trauma caused by inflammatory process." Id.  Differential diagnoses included traumatic nerve injury and SIRVA, and "sympathetically mediate pain such as chronic regional pain syndrome as the patient's pain seems out of proportion to the physical findings and pain and dysesthesias have only worsened since October." Id. at 1-2.

On August 3, 2020, Petitioner had a telemedicine appointment with her PCP, and she reported "ongoing tingling sensations/dysesthesia." Pet. Ex. 5 at 136.  Petitioner reported "[s]he feels it does not interfere with her activities to function[,] but she will occasionally drive with her right hand in order to avoid this" and she also reported "that at times she will also feel weakness on the left arm but she resists to not using it as much as she tends to favor her right side." Id.  Her PCP recommended physical therapy and Petitioner agreed.  Id. at 137.  Petitioner's PCP also

3

recommended referral to a pain management specialist, to which she declined because she wishes to try physical therapy first.[4]  Id.

On November 4, 2020, Petitioner followed up with her neurologist by telemedicine for her left arm, and she reported continued radiating numbness and tingling in her left arm.  Pet. Ex. 36 at 158.  This was Petitioner's last medical visit for her left arm.

Between November 5, 2020 and May 4, 2023, Petitioner received care from her PCP, her neurologist, functional medicine specialists, gastroenterologists, an emergency room, and an inpatient hospitalization.  See Pet. Ex. 5 at 181, 302-05, 324; Pet. Ex. 8 at 185; Pet. Ex. 11 at 18; Pet. Ex. 13 at 3-5; Pet. Ex. 35 at 11-12, 51, 157-58; Pet. Ex. 36 at 81-83, 186-88, 211-14; Pet. Ex. 44 at 39.  She saw these providers for metabolic encephalopathy, cognitive difficulties, unclear speech, altered mental status, dysarthria, episodes of generalized body tingling, paranoia, elevated ammonia, a rash, back pain, tingling in her right hand and bilateral feet, confusion, mania, brain fog, feeling intoxicated, stuttering, problems with word formation, paresthesia in the right hand, anxiety, tinnitus, bartonella infection, vitamin deficiencies, a colonoscopy, and a laparoscopic surgery.  See Pet. Ex. 5 at 181, 302-05, 324; Pet. Ex. 8 at 185; Pet. Ex. 11 at 18; Pet. Ex. 13 at 3-5; Pet. Ex. 35 at 11-12, 51, 157-58; Pet. Ex. 36 at 81-83, 186-88, 211-14; Pet. Ex. 44 at 39.

During this period, she complained of left arm symptoms on November 19, 2020 ("constant tingling sensation in her left arm since she received her flu shot about [eight] months ago"), on February 15, 2021 ("constant numbness in her left hand associated with tingling sensation since flu shot in 2019"), and on August 4, 2021 ("[o]n and off . . . numbness in her left arm radiating from the shoulder joint to her fingers . . . since she received the flu vaccine in 2019") while seeking treatment for other issues.  Pet. Ex. 8 at 181; Pet. Ex. 15 at 33; Pet. Ex. 36 at 147.  However, all examinations of Petitioner's left arm from November 5, 2020 to May 4, 2023 were normal.  See Pet. Ex. 5 at 227, 253, 287, 293-94, 304, 325, 376; Pet. Ex. 8 at 181, 185; Pet. Ex. 35 at 11-12, 51, 157-58; Pet. Ex. 36 at 81-83, 186-88, 211-14; Pet. Ex. 44 at 39.

### B.   Petitioner's Declarations

Petitioner executed three declarations, dated January 5, 2021, June 22, 2023, and February 10, 2025.  Pet. Exs. 1, 41, 50.[5]  Petitioner avers she had no left shoulder issues prior to her flu vaccination on October 29, 2019.  Pet. Ex. 1 at ¶¶ 3-4.

Immediately following the flu vaccination on October 29, 2019, she developed pain in her left arm she described as "a burning sensation radiating from the injection[] site down [her] arm."  Pet. Ex. 41 at ¶ 2; see also Pet. Ex. 1 at ¶ 5; Pet. Ex. 50 at ¶ 2.  This "immediate, intense pain . . . lasted for two or three days, before gradually lessening."  Pet. Ex. 41 at ¶ 4.  A few days

---

[4] It does not appear that Petitioner attended physical therapy.

[5] A significant portion of her third declaration discusses medical issues that do not relate to her vaccine injury, and therefore, they are not discussed herein.  See Pet. Ex. 50 at ¶¶ 8-19.

following vaccination, Petitioner began experiencing the constant sensation of "pins and needles" in her left arm.  Pet. Ex. 1 at ¶ 5; Pet. Ex. 41 at ¶ 4; Pet. Ex. 50 at ¶ 2.

Petitioner described the stress and effects of her workers' compensation claim, which she avers affected her relationships with co-workers and her mental health, leading to her questioning herself and her symptoms and causing anxiety.  Pet. Ex. 41 at ¶¶ 6-9; Pet. Ex. 50 at ¶¶ 3-6.  Following her workers' compensation action, she reports she now experiences self-doubt and reluctance in reporting illnesses or pain or seeking treatment due to the fear of not being believed and a generalized distrust of medical professionals.  Pet. Ex. 41 at ¶¶ 12-13.

Regarding her delay in first seeking treatment, Petitioner explains that she had difficulty finding providers that were approved by workers' compensation.  Pet. Ex. 50 at ¶¶ 3-4.

Three days a week, she would commute to work, which was a one-hour drive each way, and "sometimes" her arm felt as if it had "fallen asleep."  Pet. Ex. 41 at ¶ 11; see also Pet. Ex. 50 at ¶ 7.  Petitioner is no longer working, as of February 2025, which has added to her stress.  Pet. Ex. 50 at ¶ 17.

As of the date of her first declaration, January 5, 2021, she "continue[d] to have difficulties with activities of daily life due to [her] ongoing left shoulder pain and other health problems."  Pet. Ex. 1 at ¶ 10.

In her second declaration, executed June 22, 2023, she maintained she was "unable to enjoy [] activities with [her] family."  Pet. Ex. 41 at ¶ 13.  She averred that she continued to experience "burning, tingling, numbness, and weakness in [her] left shoulder, arm, and hand."  Id. at ¶ 10.  She reported "more occasional pain, tingling, and weakness in [her] arm, especially after . . . using [her] arm," pain and tingling when sleeping on her left side, and a "noticeable strength deficit in [her] left arm."  Id. at ¶¶ 10-11.  She further reported "no longer [being] able to work in [her] garden, pick up and hug the children in [her] family, or drive for any extended length of time."  Id. at ¶ 11; see also Pet. Ex. 50 at ¶ 7.

As of February 10, 2025, the date on which she executed her third declaration, Petitioner's "left arm [was] better, but . . . not 100 percent."  Pet. Ex. 50 at ¶ 20.  She still had "some lingering weakness" in her left hand and persistent "pins and needles," but the pins and needles sensation no longer caused her pain or kept her awake at night.  Id.

## III.   PARTIES' CONTENTIONS

### A.   Pain and Suffering

#### 1.   Petitioner's Contentions

Petitioner requests a pain and suffering award of $70,000.00.  Pet. Memo. at 20; Pet. Reply Memo. at 10.  Petitioner contends her medical records and declarations support this pain and suffering award, despite the fact that "Petitioner's own account of her pain and suffering and especially her emotional distress[] [] did not often make it into [] notes or . . . records."  Pet.

5

Memo. at 13-14 (citing Pet. Ex. 3 at 1-2; Pet. Ex. 5 at 58-60, 98-101, 115, 130, 137, 153, 293, 341, 422, 446; Pet. Ex. 6 at 6-7, 9-10; Pet. Ex. 36 at 155-58; Pet. Ex. 41; Pet. Ex. 50).

Petitioner contends her symptoms were "severe and persistent." Pet. Reply Memo. at 2. Immediately after vaccination on October 29, 2019, Petitioner experienced pain that was "so severe that her supervisor noted her 'excruciating pain immediately following her flu shot,' as well as a persistent 'numbness in her arm.'" Id. (quoting Pet. Ex. 17 at 336). Her co-workers noted Petitioner's pain was so severe that she "went into her office and cried." Id. (quoting Pet. Ex. 17 at 321; Pet. Ex. 6 at 6). On December 10, 2019, Petitioner's treating physician documented Petitioner's reports of "sharp pain down her left arm" and "pins and needles" sensations since her flu vaccination. Pet. Reply Memo. at 2 (quoting Pet. Ex. 5 at 58, 84). Eight months post-vaccination, Petitioner had difficulty sleeping on her left side due to pain. Id. (citing Pet. Ex. 5 at 107-08). And more than three years after vaccination, Petitioner "continued experiencing persistent pain, weakness, burning, tingling, and numbness in her arm, which hurt her ability to perform household tasks, drive a vehicle, work in her garden, or play with her grandchildren." Id. (citing Pet. Ex. 41 at ¶ 11).

Regarding Petitioner's delay in seeking treatment or Petitioner's decision to not seek certain specialized treatment, Petitioner contends her workers' compensation action complicated these efforts. Pet. Reply Memo. at 3. Because of her workers' compensation action, Petitioner could only see certain providers and had difficulty finding and making appointments with approved providers. Id. Additionally, Petitioner contends her workers' compensation "refused to cover" physical therapy. Pet. Memo. at 16. Thus, Petitioner argues her delay in seeking treatment or seeking certain specialized treatment "does not minimize the severity of her injury." Pet. Reply Memo. at 3-4.

Petitioner acknowledges that the Court, in determining an appropriate pain and suffering award, looks to a Petitioner's pursuit of medical care to aid in determination of the severity of the injury "over and against other evidence in the record which demonstrates limitations imposed by an injury." Pet. Memo. at 13. Here, however, Petitioner argues that "because Petitioner suffered a direct nerve injury and not a SIRVA, basing damages valuations on how many physical therapy or medical appointments she attended would not provide an accurate calculation of the damages she suffered from her nerve injury." Id. at 14; see also Pet. Reply Memo. at 4. Petitioner adds that treatment for SIRVA injuries is different than for nerve injuries; "Nerve injuries often include numbness, tingling, and burning sensations that reduce a petitioner's functionality in ways that typical SIRVA injuries do not." Pet. Reply Memo. at 4. Therefore, Petitioner contends "the severity of [her] nerve injury cannot be quantitatively measured by the number of physical therapy appointments that Petitioner attended." Id.

Petitioner also argues she suffered "significant emotional distress from her vaccine injury," and that Respondent did not factor this into damages. Pet. Reply Memo. at 4; see also Pet. Memo. at 17-18. This emotional distress includes "being accused of manufacturing her documented pain and discomfort for attention by the medical providers associated with her worker's compensation claim." Pet. Reply Memo. at 4; see also Pet. Memo. at 17-18. And "[t]hese false accusations and dismissive responses by workers' compensation administrators led to further delays in Petitioner's treatment of her nerve injury caused by the vaccine, which

6

prolonged her pain and significantly increased her emotional distress." Pet. Reply Memo. at 4-5; see also Pet. Memo. at 17-18.

Next, Petitioner discusses prior Vaccine Program cases to support her request for $70,000.00 in pain and suffering. Pet. Memo. at 14-20; Pet. Reply Memo. at 5-10. Petitioner agrees with Respondent that there are no reasoned damages decisions for direct nerve injuries. Pet. Reply Memo. at 5. "Petitioner [also] agrees that decisions adopting proffers and settlements are not controlling authority and are less persuasive than a fully reasoned damages decision." Id. at 6. However, Petitioner argues proffers and stipulations are helpful reference points here "given the absence of reasoned damages decisions regarding direct nerve injuries." Id.

Petitioner first discusses Kirby, a case of a direct nerve injury from vaccination. Pet. Memo. at 14 (citing Kirby v. Sec'y of Health & Hum. Servs., No. 16-185V, 2019 WL 6336026 (Fed. Cl. Spec. Mstr. Nov. 1, 2019), rev'd, 148 Fed. Cl. 530 (2020), rev'd, 997 F.3d 1378 (Fed. Cir. 2021)). In Kirby, the petitioner was found entitled to compensation and the proffered award was $25,000.00. Id. at 15; see Kirby v. Sec'y of Health & Hum. Servs., No. 16-185V, 2019 WL 7667645 (Fed. Cl. Spec. Mstr. Dec. 30, 2019). Petitioner here argues this amount should be distinguished from her case "because the severity and duration of the nerve injury" here and in Kirby differ. Pet. Memo. at 14-15. Petitioner maintains her injury was "far more severe" than the Kirby petitioner's injury. Id. at 15. The petitioner in Kirby described her pain as a 2/10 one month post-vaccination, her EMG testing was negative and showed 5/5 strength, and two months post-vaccination she was discharged from physical therapy with full strength and 0/10 pain. Id. Two years post-vaccination, the Kirby petitioner reported recurring pain that she and her provider documented as mild. Id.

In contrast, Petitioner here argues her immediate pain was "so severe" and "excruciating," unlike the Kirby petitioner's "mild" pain. Pet. Memo. at 15. Petitioner here developed persistent tingling and numbness, which has continued for years, while Petitioner contends the Kirby petitioner's injury "subsided within a few months." Id. at 16, 18. But see Kirby, 997 F.3d at 1381-82 (citing medical records documenting the petitioner's reports of intermittent pain two years post-vaccination). Although Petitioner did not attend physical therapy like the petitioner in Kirby, Petitioner argues her severity was more severe due to her workers' compensation claim, including the difficulty in finding providers her workers' compensation approved of and the negative treatment she received when pursuing her workers' compensation claim. Pet. Memo. at 16-18.

Petitioner next addressed Respondent's reliance on Anderson and Perez, two nerve injury cases that resolved via stipulation, during the parties' informal settlement discussions. Pet. Memo. at 18-19 (citing Anderson v. Sec'y of Health & Hum. Servs., No. 16-1099V, 2020 WL 974170, at *1 (Fed. Cl. Spec. Mstr. Jan. 23, 2020) ($15,000.00 settlement for an ulnar nerve injury); Perez v. Sec'y of Health & Hum. Servs., No. 21-998V, 2023 WL 7181644, at *1 (Fed. Cl. Spec. Mstr. Aug. 28, 2023) ($30,000.00 settlement for left radial nerve palsy). Petitioner stresses there is a lack of information available for these cases, including the reasoning for these settlement amounts, and thus, less weight should be given to them. Id.; Pet. Reply Memo. at 5.

7

Petitioner argues her case is most analogous to Dore, a SIRVA case resolved via stipulation. Pet. Memo. at 19-20; Pet. Reply. Memo. at 6; see Dore v. Sec'y of Health & Hum. Servs., No. 17-2012V, 2019 WL 7557796, at *1 (Fed. Cl. Spec. Mstr. Dec. 9, 2019) (settling for $80,000.00). However, the facts and circumstances in Dore, like other settled matters, are also not public.[6] Petitioner's counsel reasons that the facts in Dore were closely analogous to the facts here, and thus Dore is "a viable reference point of comparison." Pet. Reply Memo. at 6. "Petitioner [does] not claim that Dore [is] controlling authority in this case, but rather a helpful comparison point for a similar nerve injury to Petitioner's injury." Id. Petitioner does not address the fact that the injury in Dore is a SIRVA, not a nerve injury.

Lastly, Petitioner addresses Respondent's reliance on Hiatt and Turnquest in Respondent's brief on damages. Pet. Reply Memo. at 6-8 (citing Hiatt v. Sec'y of Health & Hum. Servs., No. 23-1560V, 2025 WL 1542314 (Fed. Cl. Spec. Mstr. May 13, 2025); Turnquest v. Sec'y of Health & Hum. Servs., No. 21-0065V, 2024 WL 3665961 (Fed. Cl. Spec. Mstr. July 2, 2024)). Petitioner first argues these cases are not analogous to Petitioner's case because they are mild SIRVA cases, not severe nerve injury cases, and therefore "the damages valuations in those cases are inapposite to Petitioner's damages." Id. at 6-7.

Petitioner then discusses the factual differences between Petitioner's case and the petitioners in Hiatt and Turnquest. Pet. Reply Memo. at 6-8. The petitioner in Hiatt was a 76-year-old retiree who suffered a mild SIRVA. Id. at 6 (citing Hiatt, 2025 WL 1542314, at *1, *8-10). She first reported her symptoms four months after vaccination and agreed her left shoulder pain was "mild to moderate." Id. at 6-7 (citing Hiatt, 2025 WL 1542314, at *8-10). The Court in Hiatt awarded $25,000.00 in damages to the petitioner for her mild SIRVA injury that lasted eight months and required limited treatment. Id. at 7 (citing Hiatt, 2025 WL 1542314, at *10). And the Turnquest petitioner had a treatment course consisting of three orthopedic visits, one x-ray, one MRI, and two substantial gaps in treatment. Id. (citing Turnquest, 2024 WL 3665961, at *5-7). The Turnquest petitioner was awarded $30,000.00. Turnquest, 2024 WL 3665961, at *6-7.

Unlike the petitioners in Hiatt and Turnquest, Petitioner contends she never described her symptoms as mild and her symptoms have persisted for years. Pet. Reply. Memo. at 7-8. Furthermore, as noted by the Court in Hiatt, "medical professionals tend to self-treat their shoulder injuries, delaying formal medical treatment." Id. at 8 (quoting Hiatt, 2025 WL 1542314, at *6). Thus, Petitioner contends her role as a nurse and medical professional should be taken into consideration when evaluating her delay in seeking treatment.[7] Id.

---

[6] Petitioner's counsel filed the amended petition in Dore, a case in which he was also the attorney of record. However, that petitioner's medical information is not public. Therefore, the undersigned will not discuss on Petitioner's counsel's recitations of the facts of that case as this information in Dore is sealed.

[7] Petitioner "was employed as an Associate Kidney Care Advocate for Watertown Dialysis Center when she received the vaccination." Am. Petition at ¶ 3; see also Pet. Ex. 17 at 3.

Petitioner maintains she is entitled to an award for no less than $70,000.00 for her direct nerve injury following flu vaccination. Pet. Reply Memo. at 10.

### 2.     Respondent's Contentions

Respondent argues that based on the facts of this case, Petitioner should be awarded $30,000.00 for pain and suffering. Resp. Br. at 1, 5-7. First, Respondent does not dispute awareness of injury. See id. at 1-7.

Respondent contends "Petitioner suffered a relatively mild nerve injury in her left arm." Resp. Br. at 5. For support, Respondent notes Petitioner reported initial sharp pain during her vaccination, but subsequently, her records document reported symptoms that were "limited and primarily sensory, including numbness and tingling." Id. (citing Pet. Ex. 5 at 98, 101, 137). Additionally, Respondent contends that "nearly all full-strength neurologic exams, lack of any prescription or over-the-counter medications for pain, and [Petitioner's] choice not to pursue physical therapy or pain management care" are further evidence of the "mild and sensory nature of her injury." Id. (citing Pet. Ex. 3 at 1; Pet. Ex. 5 at 99, 101-02, 108, 227). Thus, "[P]etitioner's treatment was limited to office visits in which she was evaluated by her PCP and specialists, but no treatment visits." Id. (citing, e.g., Pet. Ex. 3 at 1; Pet. Ex. 5 at 41, 98, 101, 108, 137).

With regard to Petitioner's reliance on Anderson and Perez, Respondent notes these cases were discussed during the parties' informal damages negotiations and argues it is "wholly inappropriate to disclose counsels' discussions of informal resolution of damages." Resp. Br. at 5. Both cases were resolved via settlement and Petitioner's counsel was not the attorney of record. Id. at 5-6. Respondent asserts counsel is not permitted to discuss the details of these cases "beyond their basic existence." Id. at 6. Thus, they provide "very little information" to the Court in the present case. Id.

Similarly, Respondent disagrees with Petitioner's reliance on Dore. Resp. Br. at 6. Respondent maintains "[a] settlement between parties should not be equated to a reasoned decision by the Court, and because the facts of Dore are not publicly available, the Court would have difficulty making comparisons in a public decision." Id.

Respondent notes he could not find a reasoned damages decision for a similar injury and finds reliance on reasoned damages decisions for musculoskeletal shoulder injuries in Hiatt and Turnquest helpful. Resp. Br. at 6 (citing Hiatt, 2025 WL 1542315; Turnquest, 2024 WL 3665961). Respondent explains the petitioners in Hiatt and Turnquest had an initial delay in treatment, similar to Petitioner here. Id. (citing Hiatt, 2025 WL 1542314, at *1-2; Turnquest, 2024 WL 3665961, at *4). The petitioner in Turnquest saw orthopedists for issues other than his shoulder, and the petitioner in Hiatt completed eight physical therapy sessions and received a steroid injection. Id. at 6-7 (citing Hiatt, 2025 WL 1542314, at *3; Turnquest, 2024 WL 3665961, at *6). Here, Petitioner "did not take medication or undergo any treatment for her injury." Id. at 7. Thus, Respondent contends Petitioner's pain and suffering award should be like those in Hiatt ($25,000.00) and Turnquest ($30,000.00). Id. at 6-7.

Respondent concludes Petitioner failed to show a pain and suffering award of $70,000.00 is supported by the facts of her case or comparable cases. Resp. Br. at 7. Respondent maintains a pain and suffering award of $30,000.00 is reasonable, fair, and appropriate. Id.

## IV. LEGAL FRAMEWORK

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4). Petitioner bears the burden of proof with respect to each element of compensation requested. Brewer v. Sec'y of Health & Hum. Servs., No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. I.D. v. Sec'y of Health & Hum. Servs., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); Stansfield v. Sec'y of Health & Hum. Servs., No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: (i) awareness of the injury; (ii) severity of the injury; and (iii) duration of the suffering. I.D., 2013 WL 2448125, at *9 (quoting McAllister v. Sec'y of Health & Hum. Servs., No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated & remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995)).

The undersigned may look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in this case. See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs., 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). The undersigned may also rely on her experience adjudicating similar claims. Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. See Graves v. Sec'y of Health & Hum. Servs., 109 Fed. Cl. 579 (2013).

In Graves, Judge Merow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." Graves, 109 Fed. Cl. at 589-90. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. Id. at 595.

10

V.     ANALYSIS

    A.     **Petitioner's Award for Actual Pain and Suffering**

In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases. The undersigned has reviewed the entire record, including medical records, declarations, expert reports, and all other evidence that has been filed, and finds an award of $35,000.00 in actual pain and suffering is fair, reasonable, and appropriate here.

It is appropriate to consider the severity of the injury, awareness of the injury, and duration of the suffering when determining an award for pain and suffering and emotional distress. In this case, neither party has raised, nor is the undersigned aware of, any issue concerning Petitioner's awareness of suffering. Thus, based on the circumstances of this case, the undersigned determines Petitioner's awareness of the injury is not in dispute and she has full awareness of her suffering.

The factors that particularly influence this Decision are as follows. Regarding duration, the undersigned finds Petitioner suffered from her injury for just less than two years, from October 29, 2019 to August 4, 2021. Petitioner's last medical visit for her left arm was on November 4, 2020, one year post-vaccination. Thereafter, while at visits for other medical issues, Petitioner complained of her left arm symptoms on November 19, 2020, February 15, 2021, and August 4, 2021. No medical records past August 4, 2021 document any reports of left arm symptoms.

Petitioner executed two declarations after August 2021, dated June 22, 2023 and February 10, 2025, attesting to the fact that she still had left arm symptoms that affect her activities of daily living. However, the undersigned is not persuaded by these statements in these declarations for two reasons.

First, these declarations were executed after litigation was initiated and years after Petitioner last visited a provider for her symptoms or discussed her symptoms with a provider. See, e.g., Zumwalt v. Sec'y of Health & Hum. Servs., No. 16-994V, 2019 WL 1953739, at *19 (Fed. Cl. Spec. Mstr. Mar. 21, 2019) (rejecting opinion from a treating provider when he presented an opinion two-and-one-half years after treatment and after litigation was initiated), mot. for rev. den'd, 146 Fed. Cl. 525 (2019).

Second, the declarations are not consistent with Petitioner's statements in the medical records, and therefore, the undersigned finds more weight should be given to the contemporaneous statements in her medical records. See Vergara ex rel. J.A.V. v. Sec'y of Health & Hum. Servs., No. 08-882V, 2014 WL 2795491, at *4 (Fed. Cl. Spec. Mstr. May 15, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recorded in later medical histories, affidavits, or trial testimony."); Campbell ex rel. Campbell v. Sec'y of Health & Hum. Servs., 69 Fed. Cl. 775, 779 (2006) ("It is,

11

of course, true that where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight.").

Specifically, in her second declaration, executed in June 2023, Petitioner reported "occasional pain, tingling, and weakness in [her] arm, especially after . . . using [her] arm," pain and tingling when sleeping on her left side, a "noticeable strength deficit in [her] left arm," and "no longer [being] able to work in [her] garden, pick up and hug the children in [her] family, or drive for any extended length of time." Pet. Ex. 41 at ¶¶ 10-11. And in her third declaration, dated February 10, 2025, she reported "some lingering weakness" in her left hand and persistent "pins and needles." Pet. Ex. 50 at ¶ 20. However, her medical records fail to record any continued symptoms past August 2021.

The undersigned acknowledges that the presumption that "medical records are accurate and complete as to all the patient's physical conditions" has been rejected. Kirby v. Sec'y of Health & Hum. Servs., 997 F.3d 1378, 1382 (Fed. Cir. 2021). And that "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." Shapiro v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 532, 538 (2011). However, the undersigned finds it compelling that Petitioner has not sought treatment for her injury since November 2020 nor has she reported her symptoms since August 2021. Further, Petitioner's medical records dating back to the onset of her injury did not document weakness or strength deficits on examinations.

Regarding severity, the undersigned find Petitioner had a mild to moderate injury. Petitioner had severe pain for a few days that dissipated and turned to "pins and needles," tingling, and numbness in her left arm. Petitioner saw providers for her left arm symptoms until November 4, 2020, one year post-vaccination. And after November 4, she reported her left arm symptoms three times, at visits for other medical issues, the last of which was on August 4, 2021.

To summarize, on December 10, 2019, 45 days post-vaccination, Petitioner first complained of her left arm symptoms to a provider. At this visit, she reported a "sharp pain down her left arm" when she received her flu vaccination in October 2019. Pet. Ex. 5 at 58. Petitioner reported she no longer had pain but felt "pins and needles and some numbness." Id. She also reported her symptoms "do[] not [a]ffect the strength of her arm" and were "more of an annoyance than anything." Id. Examination of her left arm was normal. She had full strength and range of motion. Assessment was "[p]ain in left arm." Id.

At her next visit on June 1, 2020, she saw a neurologist. She reiterated she developed instant severe pain at the time of vaccination "that caused her to cry," following by a tingling sensation. Pet. Ex. 5 at 101. Examination revealed full strength, full reflexes, no weakness, and full range of motion. Sensory examination revealed decreased pinprick sensation on the left arm and left upper extremity. Assessment was "[p]aresthesia of the skin." Id. at 102. Petitioner's "change in sensation" in her left arm was noted. Id.

On August 3, 2020, Petitioner reported "ongoing tingling sensations/dysesthesia" to her PCP but explained that "[s]he fe[lt] it does not interfere with her activities to function[,] but she will occasionally drive with her right hand in order to avoid this" and "that at times she will also

12

feel weakness on the left arm but she resists to not using it as much as she tends to favor her right side." Pet. Ex. 5 at 136.

Overall, Petitioner's medical records demonstrate she developed initial pain that was severe and immediate and lasted for a few days.  This is also consistent with her declaration, in which she averred she developed an immediate "burning sensation radiating from the injection[] site down [her] arm" and "[t]his "immediate, intense pain . . . lasted for two or three days, before gradually lessening." Pet. Ex. 41 at ¶¶ 2, 4.  She then developed numbness and tingling, or "pins and needles" shortly thereafter.  At all times, her physical examinations were normal, depicting full strength and range of motion and no weakness, except for a decreased pinprick sensation on the left arm and left upper extremity in June 2020.

Her medical records and declarations conflict as to the effect of her injury.  For example, in her second declaration executed in June 2023, Petitioner reported she was "unable to enjoy [] activities with [her] family." Pet. Ex. 41 at ¶ 13.  She reported she could not "work in [her] garden, pick up and hug the children in [her] family, or drive for any extended length of time." Id. at ¶ 11.  However, her medical records in 2019 and 2020 document Petitioner's reports that her symptoms "[did] not interfere with her activities to function" and were "more of an annoyance than anything." Pet. Ex. 5 at 58, 136.  And as mentioned above, her declaration also reports "occasional pain, tingling, and weakness in [her] arm" and a "noticeable strength deficit in [her] left arm," which is not supported by the medical records as all physical examinations documented full strength and no weakness. Pet. Ex. 41 at ¶¶ at 10-11.  Therefore, for the reasons described above, the undersigned finds Petitioner's statements in her contemporaneous medical records more persuasive.

Petitioner contends her stress and anxiety that resulted from her workers' compensation claim should be taken into account here.  The undersigned factors Petitioner's stress into the award here.

Lastly, the undersigned does not find a treatment gap here to be persuasive evidence arguing against the severity of her injury.  Petitioner adequately described her difficulty in making appointments.  Additionally, the Covid-19 pandemic added additional difficulty in seeking treatment.  And, in the undersigned's experience, individuals who work in the medical field typical delay seeking treatment.

The undersigned has considered prior pain and suffering awards in the parties' cases to assist in her determination of an appropriate award.  Because there are no reasoned damages decisions for nerve injuries, the parties discussed stipulated or proffered matters as well as cases involving a SIRVA injury.

As to the stipulated and proffered cases mentioned by the parties, the undersigned finds the settled amounts informative.  See Kirby, 2019 WL 7667645 (proffered award of $25,000.00 for a direct nerve injury); Anderson, 2020 WL 974170 ($15,000.00 settlement for an ulnar nerve injury); Perez, 2023 WL 7181644 ($30,000.00 settlement for left radial nerve palsy); Dore, 2019 WL 7557796 ($80,000.00 settlement for SIRVA); Hiatt, 2025 WL 1542315 (awarding

13

$25,000.00 in a SIRVA); Turnquest, 2024 WL 3665961 (awarding $30,000.00 in a SIRVA). Of these cases, Kirby is the only nerve injury case with publicly available facts.

Petitioner contended her case is most analogous to Dore; however, Dore was a SIRVA case and the facts and circumstance to support that stipulated award are sealed. Further, Petitioner argued that "because Petitioner suffered a direct nerve injury and not a SIRVA, basing damages valuations on how many physical therapy or medical appointments she attended would not provide an accurate calculation of the damages she suffered from her nerve injury." Pet. Memo. at 14; see also Pet. Reply Memo. at 4. Petitioner maintained treatment for SIRVA injuries is different than for nerve injuries, as "[n]erve injuries often include numbness, tingling, and burning sensations that reduce a petitioner's functionality in ways that typical SIRVA injuries do not." Pet. Reply Memo. at 4. Petitioner failed to properly[8] explain how her nerve injury case was analogous to the Dore SIRVA matter, and why this SIRVA case should provide an accurate calculation of her damages as compared to the other SIRVA cases discussed by the parties.

The undersigned finds the most analogous case is Kirby, as that case was as a nerve injury and the facts and circumstances of that case are public. The petitioner in Kirby first sought treatment one week post-vaccination, for "persistent arm pain, numbness, and tingling that began immediately after the [flu vaccine]." Kirby, 997 F.3d at 1379. Here, Petitioner reported similar symptoms but did not see a provider for these symptoms until 45 days post-vaccination. The petitioner in Kirby described her initial pain as moderate, while Petitioner has described her initial pain as "severe" and "intense." Id. Both the Kirby petitioner and Petitioner here complained of weakness and reduced strength. Id. Less than two months post-vaccination, the Kirby petitioner reported less pain, describing it as "mild and intermittent," improved strength, and continued numbness. Id. at 1380. Similarly, Petitioner, 45 days post-vaccination, reported she no longer had pain but had "pins and needles and some numbness." Pet. Ex. 5 at 58. Both the Kirby petitioner and Petitioner here underwent EMGs, despite their differing results. Kirby, 997 F.3d at 1380. Unlike Petitioner here, the Kirby petitioner attended physical therapy in-person for one month and continued with at-home exercises. Id. And both the Kirby petitioner and Petitioner here visited other providers, for different medical issues, that did not document any arm symptoms. Id. The Kirby petitioner last complained of "mild and intermittent pain in her right arm" two years post-vaccination, although she maintained no limitations due to pain and no muscle weakness. Id. Similarly, Petitioner here last complained of her symptoms ("[o]n and off . . . numbness in her left arm radiating from the shoulder joint to her fingers . . . since she received the flu vaccine in 2019") to a provider less than two years post-vaccination but maintains continued limitations due to her arm. Pet. Ex. 15 at 33. Lastly, Petitioner here underwent emotional distress.

The undersigned has considered the numbers proposed by both parties, however, she does not agree that the amount suggested by either party is appropriate.

---

[8] Again, the undersigned finds it improper to discuss the facts of Dore, as the facts, medical records, and other evidence in Dore are sealed and not available to the public.

14

Considering the record as a whole, the undersigned finds that $35,000.00 represents a fair, reasonable, and appropriate amount of compensation for Petitioner's pain and suffering and emotional distress. The undersigned recognizes Petitioner's duration and severity of suffering. Petitioner did not require specialized treatment for her injury. She did not attend physical therapy or go to a pain management specialist. She saw treating providers for her injury for one year. Although Petitioner described various other stressors and health issues since her vaccination, those do not relate to her vaccine injury. Thus, the undersigned finds Petitioner's overall course to be mild to moderate similar to that experienced by the Kirby petitioner, although Petitioner here had initial pain that was severe and intense. The award of $35,000.00 acknowledges that Petitioner experienced the difficulties described and acknowledges the effects it has on Petitioner's ability to enjoy certain activities and emotional distress.

## VI.  CONCLUSION

In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.

In light of the above analysis, and in consideration of the record as a whole, the undersigned awards Petitioner:

> **A lump sum payment of $35,000.00 for actual pain and suffering, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.**

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** herewith.[9]

**IT IS SO ORDERED.**

> s/Nora Beth Dorsey
> Nora Beth Dorsey
> Special Master

---

[9] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties' joint filing of notice renouncing the right to seek review.